# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| SBJ IP HOLDINGS 1, LLC | § | |
| | § | |
| vs. | § | CASE NO. 2:09-CV-29-CE |
| | § | |
| BLOCKBUSTER INC., ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

## I.      INTRODUCTION

Plaintiff SBJ IP Holdings 1, LLC ("SBJ") filed suit against numerous defendants alleging infringement of United States Patent No. 6,330,592 (the "'592 Patent") (filed December 5, 1998).  Since SBJ filed its original Markman brief, it has settled with Toys "R" Us and has reached an agreement in principle to settle with Nordstrom, leaving Buy.com, Inc. ("Buy.com") as the only participating defendant. This Order outlines the court's claim constructions for the disputed terms in the '592 Patent.

## II.      SBJ'S PATENT

The '592 Patent is entitled "Method, Memory, Product, and Code for Displaying Pre-Customized Content Associated with Visitor Data."  The invention claimed in the '592 Patent allows web site providers to: 1) provide "pre-customized" web content 2) from "cache." Using information collected about the visitor that is indicative of the visitor's preferences or interests, the invention locates predetermined content associated with that collected information and provides that "pre-customized" content to the visitor, thus providing content that appears personalized to the visitor.

The abstract of the '592 Patent states:

Visitor interests can be tracked by including "keyword directives" in content contained within the web site. These keyword directives specify a keyword

indicating the type of category of information represented by the content. As the content is delivered to the visitor in the form of a web page, the number of keyword directives attached to the content is accumulated into a specified visitor profile. Over time, this visitor profile can represent the types of information the visitor has viewed and serve as an indicator of his or her preferences. In this way, the invention can accumulate a visitor profile unobtrusively, without requiring the visitors to fill out a survey or questionnaire. The profile may also be augmented with explicit information the visitor provides over time, such as a name or address provided when ordering a product from the site. The invention then delivers personalized pages to the visitor by examining such visitor's profile.

Claim 1 of the '592 Patent is reproduced below:

A method of customizing a web site, said method comprising:

> labeling content of the web site;

> when at least one visitor accesses the content of a web site, registering the labeled accessed content in a personalized data file;

> storing the data file for the at least one visitor;

> generating at least one pre-customized display for a first visitor;

> caching the at least one pre-customized displays on the server computer;

> displaying the at least one pre-customized display to the first visitor;

> analyzing the data file of a second visitor and associating the second visitor with the at least one pre-customized display, wherein analyzing is performed after generating; and

> displaying the at least one pre-customized display to the second visitor, wherein the at least one pre-customized display is not regenerated before displaying the at least one pre-customized display to the second visitor.

# III.	GENERAL PRINCIPLES GOVERNING CLAIM CONSTRUCTION

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to and intended to be read by others skilled in the particular art. *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In

addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. The approach suggested by *Texas Digital*—the assignment of a limited role to the specification—was rejected as inconsistent with decisions holding the

specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id*. What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

The '592 Patent includes claim limitations that fall within the scope of 35 U.S.C. § 112 ¶ 6. "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure. . . in support thereof, and such claim shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6. The first step in construing a means-plus-function limitation is to identify the recited function. *See Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). The second step in the analysis is to identify in the specification the

structure corresponding to the recited function. *Id.* The "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003) (citing *B. Braun v. Abbott Labs*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)). The patentee must clearly link or associate structure with the claimed function as part of the quid pro quo for allowing the patentee to express the claim in terms of function pursuant to § 112 ¶ 6. *See id.* at 1211; *see also Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1377 (Fed. Cir. 2001). The "price that must be paid" for use of means-plus-function claim language is the limitation of the claim to the means specified in the written description and equivalents thereof. *See O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997).

"If the specification does not contain an adequate disclosure of the structure that corresponds to the claimed function, the patentee will have 'failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112,' which renders the claim invalid for indefiniteness." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009) (quoting *In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc)). It is important to determine whether one of skill in the art would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing the structure. *See Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999); *Biomedino*, 490 F.3d at 953. Fundamentally, it is improper to look to the knowledge of one skilled in the art separate and apart from the disclosure of the patent. *See Medical Instrumentation*, 344 F.3d at 1211-12. "[A] challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing

evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Budde*, 250 F.3d at 1376-77.

Buy.com asserts that certain claims of the '592 Patent are indefinite. A claim is invalid for indefiniteness if it fails to particularly point out and distinctly claim the subject matter that the applicant regards as the invention. 35 U.S.C. § 112 ¶ 2. To prevail on an indefiniteness argument, the party seeking to invalidate a claim must prove "by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008). The primary purpose of the definiteness requirement is to ensure public notice of the scope of the patentee's legal right to exclude, such that interested members of the public can determine whether or not they infringe. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005); *Halliburton*, 514 F.3d at 1249; *Honeywell Int'l Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003).

Courts apply the general principles of claim construction in their efforts to construe allegedly indefinite claim terms. *Datamize,* 417 F.3d at 1348; *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007). A claim is indefinite only when a person of ordinary skill in the art is unable to understand the bounds of the claim when read in light of the specification. *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008). A determination of claim indefiniteness is a conclusion of law. *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1375-76 (Fed. Cir. 2001); *Datamize,* 417 F.3d at 1347. A claim is indefinite only if the claim is "insolubly ambiguous" or "not amenable to construction." *Exxon,* 265 F.3d at 1375;

*Young*, 492 F.3d at 1346; *Halliburton*, 514 F.3d at 1249; *Honeywell*, 341 F.3d at 1338-39. A court may find a claim indefinite "only if reasonable efforts at claim construction prove futile." *Datamize*, 417 F.3d at 1347. A claim term is not indefinite solely because the term presents a difficult claim construction issue. *Id.*; *Exxon*, 265 F.3d at 1375; *Honeywell*, 341 F.3d at 1338. "If the meaning of the claim is discernable, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, . . . the claim [is] sufficiently clear to avoid invalidity on indefiniteness grounds." *Exxon*, 265 F.3d at 1375; *Halliburton*, 514 F.3d at 1249.

## IV.    AGREED CONSTRUCTIONS OF THE TERMS OF THE '592 PATENT

| Claim Term | Agreed Construction |
|---|---|
| second visitor | A visitor different from the "first visitor." |
| accumulating the number of accesses to each category | Totaling the number of accesses to content labeled with a particular "category." |
| a count of keywords | The number of instances of a keyword in the visitor preference data. |
| time of access | How recently a visitor accessed the information. |
| displaying the at least one precustomized display to the second visitor, wherein the at least one pre-customized display is not regenerated before displaying | Showing the at least one precustomized display" to the "second visitor" wherein the previously generated "pre-customized display" is loaded from a cache and not dynamically recreated before showing. |
| web content item | Any item that can be accessed and viewed by a visitor, such as an entire web page, a component of a web page, an insertion into a web page or a graphic link. |
| selected categories | Specified "categories." |

## V.    TERMS IN DISPUTE OF THE '592 PATENT

### a.    "Pre-Customized" Terms

There are a number of terms in the claims of the '592 Patent that incorporate the "pre-customization" concept (namely, "pre-customized web content item," "pre-customized display," "pre-customized file," and "pre-selected web content").  This group of "pre-customized" terms will be addressed together in this section.

### i.    "Pre-customized web content items" (Claims 11, 12)

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 11. A computer readable memory that can direct a web site server computer to function in a specified manner, comprising: <br><br> visitor files stored in said computer memory of said web site server computer; <br><br> **pre-customized web content items** stored in said computer memory of said web site server computer; and <br><br> executable instructions stored in said computer memory of said web site server computer, said executable instructions including <br><br> (a) instructions to access an existing visitor file for a visitor; <br><br> (b) instructions to review data in existing visitor file to determine visitor preferences; and <br><br> (c) instructions, based on said visitor preferences, to provide pre-customized files to visitor. | Web content item(s) having a predetermined association that can be used to enable the appearance of customization/ personalization for visitors. | Personalized "web content items" previously assembled for another visitor. |

The parties have agreed that a "web content item" is "any item that can be accessed and viewed by a visitor, such as an entire web page, an insertion into a web page or a graphic link." Therefore, a "pre-customized web content item" is any item that can be accessed and viewed by a visitor that is "pre-customized."  The parties' dispute, however, centers on the meaning of "pre-customized."

### 1. The Parties' Construction Arguments

SBJ maintains that "pre-customized" means that the content at issue (e.g., the "web content item") has (1) a predetermined association developed before a visitor comes to the web site, which (2) can be used to give the appearance of personalization. SBJ argues that when a visitor comes to the web site and indicates an interest (e.g., by viewing certain content on the web site), the invention uses that interest data to locate web content items and present them to the visitor. This predetermined association is developed before the visitor arrives at the web site. An example of this process is described in the specification:

> The present invention then delivers personalized pages to the visitor by examining such visitor's profile. Another directive, called a personalization directive, may be placed into web pages that are to be customized by the invention. These directives cause a personalization function to be applied to the visitor's profile data. The result of the personalization function *defines an attribute* to be used *for locating personalized page fragments, called "page components"*, that the invention then *assembles into a customized page for the visitor*. . . . The present invention assembles all of this data and delivers a "personalized" page to the visitor.

'592 Patent at 2:45-60 (emphasis added). Furthermore, SBJ argues that, as illustrated above, the "personalized" web content has only the appearance of personalization for a particular visitor, as opposed to being web content that is personalized solely for that particular visitor. *See also* '592 Patent at 6:14-17 ("The present invention gives the visitor the impression of a customized page visitor [sic] when in actuality it presents pre-customized pages and/or page components that have been cached.").

Buy.com, on the other hand, contends that "pre-customized" content is (1) personalized content that (2) is previously assembled for another visitor. First, Buy.com argues that the "appearance of customization/personalization" is merely a benefit of the invention as opposed to the actual invention itself. The specification states that "[t]he *benefits of the present invention*

are immediately evident. The present invention *gives the visitor the impression of a customized page* visitor [sic] when in actuality it presents pre-customized pages and/or page components that have been cached." '592 Patent at 6:14-17 (emphasis added). As such, Buy.com urges the court to reject SBJ's contention that the invention merely creates the appearance of customization. Rather, Buy.com contends that the actual invention is creating a personalized web page for "some, indeed probably most users," and therefore, the "pre-customized web content items" must be "personalized." Transcript of Markman Hearing at 57:21-58:3, Dkt. No. 257.

Second, Buy.com argues that the claim language supports the contention that "pre-customized" content is previously assembled for another visitor. As discussed below, claim 1 incorporates the "pre-customized" concept as it relates to a "pre-customized" display and states:

> 1. A method of customizing a web site, said method comprising:
> …..
> generating *at least one pre-customized display* for a first visitor;
> ….
> displaying *the* at least one pre-customized display *to the first visitor*;
> ….
> displaying *the* at least one pre-customized display *to the second visitor*, wherein *the* at least one pre-customized display *is not regenerated* before displaying the at least one pre-customized display to the second visitor.

Buy.com argues that claim 1 uses the definite article "the" to refer to the "pre-customized display" in the last step of the claim because the same "pre-customized display" generated for the first visitor is displayed to the second visitor. Therefore, according to Buy.com, a "pre-customized display" must mean a personalized "display" assembled for a first visitor to be later displayed to a second visitor. Furthermore, Buy.com argues that the specification clearly teaches that most visitors are shown content that was previously personalized for a prior visitor:

> [i]f one million visitors come to the site, most of the visitors simply receive a web page that was already dynamically generated for a previous visitor. In essence, the invention allows 'personalized pages' to be constructed by choosing from a set of

previously computed pages, rather than by dynamically computing each page for
every visitor.

'592 Patent at 3:18-23.   Finally, Buy.com notes that, during prosecution, the patentees

distinguished claim 1 over the prior art by arguing that:

> [c]laim 1 includes generating at least one pre-customized display for a first
> visitor, caching the display, and displaying the at least one pre-customized
> display, wherein it is not regenerated before displaying it to a second visitor.
> From the claim language when considered as a whole, *at least two visitors would
> be present and regeneration of the display for the second visitor is not required.*

Response to Final Rejection at 3, attached as Ex. B to Defendant Buy.com's Responsive

Markman Brief, Dkt. No. 234 (emphasis added).   Thus, Buy.com contends that the patentees

clearly understood "pre-customized" to refer to content that was customized for a prior visitor.

In response, SBJ acknowledges that it is certainly possible that pre-customized web

content items have been assembled and displayed to another visitor prior to being shown to a

later visitor.   However, SBJ argues that this is simply a possibility, not a hard and fast

requirement, and,  thus, should not be read into the "pre-customized" terms as a limitation.

## 2.  Analysis

Buy.com's proposed construction of "pre-customized" is inconsistent with the intrinsic

record of the '592 Patent and, therefore, the court rejects it.   First, in numerous places the

specification of the '592 Patent explains that the invention delivers "pre-customized web content

items" to a visitor to provide a "personalized" (in quotes) page to the visitor.   *See, e.g.,* '592

Patent at 3:20-24 ("In essence, the invention allows "personalized" pages to be constructed by

choosing from a set of previously computed pages, rather than by dynamically computing each

page for every visitor."); 5:49-51 ("The developer can then devise a set of Web Content Items

that can 'personalize' the Web Site for the visitor the next time the visitor accesses the web

site."); 5:55-60 ("The 'personalization' will not be a one-time dynamically generated customized

web page, which would be too resource intensive and therefore slow, but will be based on predetermined Web Content Items that are developed and then cached into memory."). In various other places, the specification states that such "personalized" web content has merely the appearance of customization for a particular visitor, as opposed to being web content that is actually personalized solely for and presented solely to that particular visitor. *See, e.g., id.* at 6:14-17 ("The present invention *gives the visitor the impression of a customized page* visitor [sic] when in actuality it presents pre-customized pages and/or page components that have been cached.") (emphasis added); 6:28-30 ("the page is illustrative of how a base page is precustomized to make it *seemingly customized* for a given visitor") (emphasis added); 3:13-23 ("Even though every visitor receives a page that *appears to be customized* for them….") (emphasis added). As such, the court rejects Buy.com's argument that "pre-customized" means "personalized." Rather, the court agrees with SBJ's contention that "pre-customized," as used in the '592 Patent, requires only the appearance of customization/personalization.

Second, the court rejects Buy.com's argument that "pre-customized" items must have been previously assembled for another visitor. Buy.com's reliance on column 3, lines 18-23 to support its contention is misplaced. That section explains that:

> a home page for a large web site might include a personalization directive describing the inclusion of an article related to a visitor's favorite NFL team…. Even though every visitor receives a page that appears to be customized for them, since, in fact, there are only 30 or so NFL teams[,] [] the caching mechanism of the invention *ensures that the dynamic page generation only occurs at most 30 or so times*. If one million visitors come to the site, *most* of the visitors simply receive a web page that was already dynamically generated for a previous visitor.

'592 at 3:6-23 (emphasis added). This example actually supports the contention that on various occasions it will be necessary for the invention to dynamically generate "pre-customized" items

for a visitor – i.e., that the "pre-customized" items were not previously assembled for another visitor.

Furthermore, the "pre-customized" concept is used throughout the '592 Patent. Specifically, as will be discussed in detail below, the "pre-customized" term is used in both claims 1 and 16 to modify the term "display." The term "pre-customized" is also used in claims 11 and 12 to modify "web content items." Claim 1 requires at least two visitors:

> A method of customizing a web site, said method comprising:
>
> labeling content of the web site;
> …
> generating at least one pre-customized display for a first visitor;
> …
> displaying the at least one pre-customized display *to the first visitor*;
>
> analyzing the data file of a second visitor and associating the second visitor with the at least one pre-customized display, wherein analyzing is performed after generating; and
>
> displaying the at least one pre-customized display *to the second visitor*, wherein the at least one pre-customized display is not regenerated before displaying the at least one pre-customized display to the second visitor.

In claims 11, 12, and 16, however, there is no mention of multiple visitors. Thus, by inserting the two-visitor concept in its proposed construction of "pre-customized," Buy.com inappropriately seeks to inject the concept of multiple visitors into claims 11, 12, and 16.

Likewise, Buy.com's prosecution history disclaimer argument is unpersuasive because the applicant was discussing only claim 1 of the '592 Patent when he explained that "at least two visitors would be present and regeneration of the display for the second visitor is not required." As just discussed, claim 1 clearly discloses two visitors, while claims 11, 12, and 16 do not. Therefore, any purported disclaimer would not require the "pre-customized" terms in claims 11, 12, and 16 also to require two visitors.

In conclusion, Buy.com's proposed construction for "pre-customized," which requires both actual personalization and assembly for another visitor, is not supported by the written description and seeks to rewrite the claims of the '592 Patent. As such, the court rejects Buy.com's proposed construction of "pre-customized." The court adopts SBJ's proposed construction because, as illustrated above, it comports with the specification and claim language. The court, therefore, concludes that "pre-customized web content items" means "web content item(s) having a predetermined association that can be used to enable the appearance of customization/personalization for visitors."

### ii. "Pre-customized display" (1, 4, 7, 9, 16)

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 1. A method of customizing a web site, said method comprising:<br><br>…<br><br>generating at least one **pre-customized display** for a first visitor;<br><br>caching the at least one **pre-customized displays** on the server computer;<br><br>displaying the at least one **pre-customized display** to the first visitor;<br><br>analyzing the data file of a second visitor and associating the second visitor with the at least one **pre-customized display**, wherein analyzing is performed after generating; and<br><br>displaying the at least one **pre-customized display** to the second visitor, wherein the at least one **pre-customized display** is not regenerated before displaying the at least one **pre-customized display** to the second visitor. | Web content items(s) having a predetermined association that can be used to enable the appearance of customization/personalization for visitors for display to a visitor. | A personalized web page assembled for a first visitor to be later displayed to a second visitor. |

### 1. The Parties' Construction Arguments

As discussed above, the parties disagree as to the construction of "pre-customized." In this case, however, the parties also disagree as to whether the pre-customized "display" consists generally of web content items (as SBJ contends) or more specifically a web page (as Buy.com contends). SBJ argues that the visitor is displayed "pre-customized web content items" – i.e.,

web content items having a predetermined association that allow for the appearance of personalization.

In response, Buy.com argues that although the parties have agreed that a "web content item" is properly construed as including an entire web page, the parties also agree that the term may include additional objects, such as web page inserts, web page components, and links. According to Buy.com, these additional objects would not be considered a "display" by a person of ordinary skill in the art. Therefore, Buy.com argues that "display" must be construed narrowly – i.e., the display must be limited to a web page. Furthermore, Buy.com argues that the specification makes it clear that a "display," as the term is used in the '592 Patent, refers to a web page. *See, e.g.*, '592 Patent at 2:34-35 ("the content is delivered to the visitor in the form of a web page…"); 2:46-47 ("[t]he present invention then delivers personalized pages to the visitor by examining such visitor's profile"); 3:18-20 ("[i]f one million visitors come to the site, most of the visitors simply receive a web page that was already dynamically generated for a previous visitor").

In reply, SBJ argues that Buy.com's proposed construction fails to account for claim differentiation principles. Specifically, dependent claim 6 recites that the "pre-customized display is a web page." According to the principle of claim differentiation, the term "pre-customized display" as used in independent claim 1 must be broader than a web page – i.e., it must be web content items generally. Therefore, SBJ argues that Buy.com's proposed construction of "display" must be rejected.

## 2. Analysis

Buy.com summarily asserts that a person of ordinary skill in the art would not consider web page inserts, web page components, and links to be a "display;" however, it cites no authority to support this contention. The court, therefore, rejects this contention.

As SBJ demonstrates, claim differentiation principles require that the "pre-customized display" in independent claim 1 be construed more broadly than the "pre-customized display [that] is a web page" in dependent claim 6. *See, e.g., Dow Chem. Co. v. United States*, 226 F.3d 1334, 1341-42 (Fed. Cir. 2000) (under the doctrine of claim differentiation, an independent claim should be given a broader scope than a dependent claim to avoid rendering the dependent claim redundant)*; Saffran v. Johnson & Johnson*, 2010 WL 3766568, at *15 (E. D. Tex. Sept. 20, 2010). Buy.com relies on *Edwards Lifesciences LLC v. Cook Inc*., 582 F.3d 1322, 1330 (Fed. Cir. 2009), to argue that the doctrine of claim differentiation does not apply here because the written description and prosecution history indicate that the patentee meant for the "pre-customized display" referenced in claim 1 to cover the same subject matter as the "pre-customized display [that] is a web page" in claim 6. The court is not persuaded by this argument. The written description of the '592 Patent never specifically equates the "pre-customized display" with a web page. Rather, the specification often describes the display as either a web page and/or individual page components. *See, e.g.*, '592 Patent at 6:66-7:5 ("The program then selects a pre-customized page or pre-customized page components which should reflect this interest. These selections can be assembled by a component assembler 340, and may be further subject to personal modification by a monogrammer 330 to make changes such as inserting the visitor's name onto the page."); 6:14-21 ("The present invention gives the visitor the impression of a customized page [] when in actuality it presents pre-customized pages and/or

page components that have been cached."). As such, the '592 Patent does not specifically equate the "pre-customized display" with a web page and, thus, the court rejects Buy.com's contention that the principle of claim differentiation should not apply in construing "pre-customized display."

The written description explicitly states that page components, as well as web pages, are included in the definition of "web content items." *Id.* at 5:26-30 ("Web Content Items can be an entire web page, a component of a web page, an insertion into a web page, a graphic link and/or any other items that can be accessed and viewed by a user."). And, as illustrated above, the specification explains that both page components and web pages are displayed to visitors. *See also id.* at 6:6-9 ("When a visitor accesses a web site that has an existing file for that visitor, the program determines from the file and the tallied categories, *which pre-customized content, i.e., the personalized page components, to provide to the visitor.*") (emphasis added). As such, the court agrees with SBJ that the "pre-customized display" is composed of web content items generally – not merely full web pages.

Finally, as discussed above, Buy.com's proposed limitation requiring that the web content item be "assembled for a first visitor to be later displayed to a second visitor" is not supported by the written description and seeks to rewrite the claims of the '592 Patent. Specifically, claim 16 requires only one visitor, but Buy.com's proposed construction would require two visitors. What is more, considering that the parties have agreed to construe "second visitor" as a visitor "different from" the first visitor, Buy.com's proposed construction would require two *different* visitors. This construction would read the following preferred embodiment out of the '592 Patent because it requires only one visitor:

> Returning to FIG. 2, the page is illustrative of how a base page is pre-customized to make it seemingly customized for a given visitor. Assuming that a visitor

frequents a sports-oriented web site in the preferred embodiment, the main story on the page could be the same for all the pre-customized pages, for example, a Super Bowl story; however, the additional stories on the page can be adjusted with inserts of personalized page components [sic] items according to the visitor's preferences, such as individual team information. Assuming that *visitor A* in prior visits has frequented a number of Web Content Items with a keyword of "football", then *when visitor A returns* to the web site a page with personalized page components will appear where the page components (e.g., 221, 223, 225) are Web Content Items comprising football-related stories.

'582 Patent at 6:28-42 (emphasis added). As such, in accordance with its previous construction of "pre-customized web content item," the court concludes that "pre-customized" does not mean that the item has been previously assembled for, or previously displayed to, a different visitor.

In conclusion, the court rejects Buy.com's proposed construction and, rather, adopts SBJ's – i.e., a "pre-customized display" is a "web content item(s), having a predetermined association that can be used to enable the appearance of customization/personalization, which is displayed to a visitor."

### iii. "Based on said visitor preferences, to provide pre-customized files to visitor" (11)

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 11. A computer readable memory that can direct a web site server computer to function in a specified manner, comprising:<br><br>visitor files stored in said computer memory of said web site server computer;<br><br>pre-customized web content items stored in said computer memory of said web site server computer; and<br><br>executable instructions stored in said computer memory of said web site server computer, said executable instructions including<br><br>(a) instructions to access an existing visitor file for a visitor;<br><br>(b) instructions to review data in existing visitor file to determine visitor preferences; and<br><br>(c) instructions, **based on said visitor preferences, to provide pre-customized files to visitor**. | Identifying at least one pre-customized web content item based on the visitor preferences and displaying the pre-customized web content item to the visitor from a file in cache so that the at least one pre-customized web content item has the appearance of customization/personalization to the visitor. | Based on the current visitor's preferences, displaying the current visitor personalized files previously assembled for another visitor. |

The parties again have their basic disagreements as to the construction of "pre-customized," this time with respect to the term "pre-customized files." The one additional difference in the parties' respective constructions concerns what it means to provide the "pre-customized files" to a visitor. The parties agree that in the context of a web site "providing" web content to a visitor, the term "providing" must mean "displaying," because that is the only way information can effectively be "provided" to the visitor. The parties, however, disagree as to the content of the "files" and where the "files" are stored and displayed from.

## 1. The Parties' Construction Arguments

SBJ argues that "pre-customized files:" (1) contain pre-customized web content items; and (2) are displayed to visitors from cache. According to SBJ, the specification describes "pre-customized files" as pre-customized web content items that are stored in a cache from which they can be retrieved:

> The component assembler uses the *pre-customized file handler* 360, to retrieve the Web Content Items, formatted as pre-customized pages, that are appropriate for this visitor. Pre-customized pages can be cached in a pre-customized file store 365, or can be dynamically generated on demand by the dynamic page generator 380.

'592 Patent at 6:60-7:11 (emphasis added). First, SBJ argues that the specification clearly equates pre-customized "files" with "web content items" – i.e., the component assembler uses the file handler to retrieve web content items. Second, SBJ argues that the construction of "files" must include the concept of caching because caching is one of the primary benefits of the invention. For example, the specification explains that:

> The benefits of the present invention are immediately evident. The present invention gives the visitor the impression of a customized page visitor when in actuality it presents pre-customized pages and/or page components *that have been cached*. The system thereby conserves computing resources and retains a higher

access speed on a server as opposed to those systems that dynamically generate customized pages for each visitor.

*Id.* at 6:6-27; *see also id.* at 5:55-60 ("The 'personalization' will not be a one-time dynamically generated customized web page, which would be too resource intensive and therefore slow, but will be based on predetermined Web Content Items that are developed and then cached into memory."); 2:61-66 ("The present invention stores personalized page components in a cache. Subsequent delivery of the same page components is satisfied by retrieving the information from the cache, rather than by dynamically generating it each time").

In response, Buy.com notes that the only specification reference to pre-customized "files" relates to the "pre-customized files handler," and this reference teaches that "[t]he component assembler uses the pre-customized file handler 360, to retrieve the Web Content Items, *formatted as pre-customized pages*, that are appropriate for this visitor." *Id.* at 6:60-7:11 (emphasis added). Buy.com argues that the specification does not equate "pre-customized files" with "web content items" generally, but rather equates the "files" with "pre-customized pages" specifically. As such, Buy.com argues that it is not appropriate to define or equate the term "file" with web content items. Buy.com does not raise any arguments as to why the court should not include SBJ's proposed "from cache" limitation in the construction of the "pre-customized files" term.

## 2. Analysis

Claim 11 teaches that visitor files and pre-customized web content items are stored in the memory of a web site server computer. Those files are then accessed and reviewed to determine visitor preferences when a visitor visits the web site. Finally, pre-customized files based on the visitors' preferences are displayed to the visitor. As such, the "pre-customized files" must be stored in the memory of the web site server – i.e., the cache. This proposition is supported by the specification, which teaches that the invention "delivers personalized pages to the visitor by

examining such visitor's profile" and that "the invention stores personalized page components in a cache." *Id.* at 2:46-66. The specification goes on to explain that "subsequent delivery of the same page components is satisfied by retrieving the information from the cache, rather than by dynamically generating it each time." *Id.* As such, the court concludes that "pre-customized files" are stored in cache.

The parties' dispute regarding the contents of the "pre-customized files" revolves around the interpretation of one statement in the specification: "[t]he component assembler uses the pre-customized file handler…to retrieve the Web Content Items, formatted as pre-customized pages, that are appropriate for this visitor." *Id.* at 7:6-8. Buy.com's argument that this language specifically equates "pre-customized files" with only web pages is not persuasive. The language at issue merely requires that the web content items in the pre-customized file handler be "formatted" as a pre-customized "page" so that it can be "provided" to the visitor – it does not require that the "pre-customized file" itself be a web page. This construction is further supported by following description:

> [i]f a visitor file exists for the current visitor, the program accesses such visitor file to determine the visitor's interests as determined by the keywords associated with prior Web Content Items served….The program then selects a *pre-customized page or pre-customized page components* which should reflect this interest. These selections can be assembled *by a component assembler*….

*Id.* at 6:60-7:6. As such, the court concludes that the pre-customized files contain "web content items" generally as opposed to web pages specifically.

In conclusion, the court construes "based on said visitor preferences, to provide pre-customized files to visitor" to mean "identifying at least one pre-customized web content item based on the visitor's preferences and displaying the pre-customized web content item to the

visitor from a file in cache so that the at least one pre-customized web content item has the appearance of customization/personalization to the visitor."

### iv. "Presenting cached pre-selected web content to the visitor, wherein such pre-selected web content is associated with the selected category" (10, 17)

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 10. A computer-readable medium having computer executable software code stored thereon, the code for personalizing a web site without dynamically generated web pages for each visitor, the code comprising: <br> … <br> code for **presenting cached pre-selected web content to the visitor, wherein such pre-selected web content is associated with the selected category.** | Identifying at least one pre-customized web content item associated with the selected category, and displaying the at least one pre-customized web content item from cache, where the at least one pre-customized web content item has the appearance of customization/ personalization to the visitor. | Displaying cached "web content items" previously assembled for another visitor to the current visitor, wherein the previously assembled "web content items" are associated with the "selected category." |

## 1. The Parties' Construction Arguments

The parties agree that the "presenting cached pre-selected web content to the visitor…" phrase means that web content items associated with a selected category are displayed to a visitor from cache. Further, the parties agree that a "selected category" is a "specified category." The parties also agree that the term "pre-selected" should be construed consistently with the term "pre-customized," and therefore, the parties' contrary constructions with regard to the meaning of pre-customized are incorporated here.

## 2. Analysis

As discussed above, the court has concluded that "pre-customized" items do not have to be previously assembled for another visitor. As such, considering that the parties have agreed that "pre-customized" should be construed consistently with "pre-selected," the court rejects Buy.com's proposed construction which would require the "web content items" to be previously assembled for another. The court concludes that "presenting cached pre-selected web content to the visitor, wherein such pre-selected web content is associated with the selected category"

means "identifying at least one pre-customized web content item associated with the selected category, and displaying the at least one pre-customized web content item from cache, where the at least one pre-customized web content item has the appearance of customization/ personalization to the visitor."

### v. "Personalizing a web site without dynamically generated web pages for each visitor" (10)

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 10. A computer-readable medium having computer executable software code stored thereon, the code for **personalizing a web site without dynamically generated web pages for each visitor, the code comprising**: | For at least one visitor, presenting pre-customized web content items from cache without dynamically creating them for each visitor. | Providing web site content to a visitor containing information customized to that visitor's specific interests by using content that was previously generated for another specific visitor. |

### 1. The Parties' Construction Arguments

The dispute over the interpretation of this phrase revolves around the parties' different interpretation of what it means to "personalize" the web site. SBJ proposes that "personalizing a web site" means to provide pre-customized web content (i.e., having a predetermined association to enable the appearance of customization/personalization) from a cache. Buy.com again seeks to add the limitation that "personalizing" requires that the web site content have been "previously generated for another specific visitor."

This limitation also includes the phrase "without dynamically generated web pages for each visitor." SBJ argues that this phrase means without dynamically creating web pages for each visitor. Buy.com, on the other hand, argues that the phrase "without dynamically generated web pages" indicates that the personalized content of the web site is created for a visitor, cached, and re-displayed to a subsequent visitor having similar interests. Therefore, Buy.com argues that the inclusion of the phrase "previously generated for another specific visitor" embraces the concept the that web pages are not dynamically generated for each visitor.

The parties also dispute whether "web content items" or "web site content" are displayed to the visitor. SBJ argues that personalized "web content items" in general are displayed to visitors. Buy.com, however, notes that the claim language itself refers to "web pages" specifically – not the more general "web content items," which can include web pages. Therefore, Buy.com argues that SBJ's construction is improper because it seeks to substitute the broader term "web content items" for the more narrow term "web pages."

### 2. Analysis

As discussed above, the court rejects Buy.com's proposed construction requiring that "personalizing" a web site means that the web site content has been "previously generated for another specific visitor." However, claim differentiation principles require that the court respect the patentees' use of the term "web pages" as opposed to "web content items." Throughout the claims, both pre-customized "web content items" and personalized "web pages" are referred to. The specification explains that "Web Content Items can be an entire web page, a component of a web page, an insertion into a web page, a graphic link and/or any other items that can be accessed and viewed by a user." As such, the invention distinguishes "web content items" generally and "web pages" specifically.

Claim 10 states "personalizing a web site without dynamically generated *web pages* for each visitor, the code comprising…." Considering that claim 10 specifically refers to web pages as opposed to web content items, the court concludes that the disputed phrase requires that "web pages" be provided to the visitor. In conclusion, the court construes "personalizing a web site without dynamically generated web pages for each visitor" to mean "for at least one visitor, presenting pre-customized web pages from cache without dynamically creating them for each visitor."

### b.  Caching and Cached Terms (Claims 1, 10, 16, and 17)

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 1. A method of customizing a web site, said method comprising: <br><br> … <br><br> generating at least one pre-customized display for a first visitor; <br><br> **caching** the at least one pre-customized displays on the server computer; <br><br> displaying the at least one pre-customized display to the first visitor; | Storing information in a manner to provide for faster access. | Temporarily storing information in a specialized memory or memory buffer for faster access and retrieval than from main memory. |

### 1.  The Parties' Construction Arguments

The parties have agreed that, except for the differences associated with verb tense, the court's construction should be the same for both "caching" (in claims 1 and 16) and "cached" (in claims 10 and 17).  Furthermore, the parties agree that "caching" is storing information to provide for faster access.  Buy.com, however, seeks to narrow the definition of "caching" by adding two limitations: 1) "temporarily" storing information in a 2) "specialized memory or memory buffer" that is different from "main memory."

First, Buy.com argues that cache memory is known in the art as a temporary storage area that allows for faster access to data and other information that a program frequently uses. Buy.com argues that at the time the '592 Patent was filed, it was recognized in the industry that "caching" was a temporary type of storage:

> Cache:
> *...A temporary storage area* for instructions and data that is closer to the CPU's speed. The larger the cache, the faster the performance, since there is a greater chance that the instruction or data required next is already in the cache. The chief measurement of a cache is its hit rage, which is the percentage of all accesses that are satisfied by the data in the cache.

Cache used to refer to only memory and disk caches (explained below) that function as temporary "lookahead" storage. *With the advent of the Web, the term is used to refer to more permanent storage. When Web pages are "cached" on a server, they can be stored for long periods of time; thus, the term is also used to mean "stored for future use," not just within the current session.*

The Computer Desktop Encyclopedia at 101-02, attached as Exhibit 3 to Plaintiff's Markman Brief, Dkt. No. 229 (emphasis added). Buy.com summarily contends that even though the encyclopedia explains that web pages "cached" on a server can be stored for long periods of time, a person of ordinary skill would still understand that the storage is temporary compared to main memory. Second, Buy.com argues that cache memory is properly construed as a "specialized memory or memory buffer" because it is distinct and often separate from main memory. *See* Modern Dictionary of Electronics at 93, attached as Exhibit C to Defendant Buy.com's Responsive Markman Brief, Dkt. No. 234 ("cache: A small, fast memory built into a processor to give faster access to the data and instructions that a program uses repeatedly (also called cache memory, buffer storage)"). Thus, Buy.com argues that a person of ordinary skill in the art would understand "caching" to mean "temporarily storing information *in a specialized memory or memory buffer* for faster access and retrieval than from main memory."

In response, SBJ argues that Buy.com's proposed construction should be rejected because it is directed to the wrong kind of cache – i.e., to a processor cache, rather than a web cache.

## 2. Analysis

Despite acknowledging that definitions for "*web* cache" exist, Buy.com inexplicably asserts that a person of ordinary skill in the art would understand that caching should be defined using definitions for "processor cache" – i.e., that the cache must be temporary and stored in a memory buffer. There is no support in the specification for defining "cache" as a "processor cache." Furthermore, Buy.com offers no evidence as to why the definition for a processor cache

is correct or even applicable.  In contrast, SBJ has pointed out that there are over 100 references to "web" in the specification, and every mention of the term "cache" is in association with storing "web" content.  *See, e.g.*, '592 Patent at 2:61-64; 5:54-59; 6:6-12; 6:14-17; 6:21-26; 7:6-11.  Although it is true that a processor cache and a web cache share the attribute of storing information in a manner to provide for faster access, Buy.com seeks to incorporate attributes of a processor cache that are not shared by a web cache.  As such, the court rejects Buy.com's proposed construction.  After considering the dictionary definition of "cache," the court concludes that the "cache" terms mean "storing information in a manner to provide for faster access in the future."  This construction comports with the ordinary meaning of the term without importing limitations that do not necessarily apply to the "caching" of web pages.

### c. Personalized Data File, Data File For a Visitor, Visitor Data File, Visitor File, Data File For at Least One Visitor, Data File of the Visitor (1, 3, 10, 11, 16, 17)[1]

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 1. A method of customizing a web site, said method comprising:<br><br>labeling content of the web site;<br><br>when at least one visitor accesses the content of a web site, registering the labeled accessed content in a **personalized data file**;<br><br>storing the data file for the at least one visitor;<br><br>… | A collection of information about or corresponding to a visitor, including interest/ preference information (such as the visitor's behaviour or demographic information), which can be provided by or observed about the visitor. | A file stored on a server computer that contains a specific visitor's preference and behaviour information based on the categories and/or keywords of the accessed content. |

### 1.  The Parties' Construction Arguments

The major difference between the parties' proposed constructions relates to the scope of the types of information that can be included in the visitor file.  Buy.com seeks to limit the type of information in the visitor file to visitor "preference" and "behavior" information that is "based

---

[1]  The parties have agreed that the same definition should apply to the following claim terms: "personalized data file" (claim 1, 3 and 16); "data file for a visitor" (claims 10 and 17); "visitor data file" (claims 10 and 17); "visitor files" (claim 11); "visitor file" (claim 11); "data file for at least one visitor" (claim 16); and "data file of the visitor" (claim 16)

on the categories and/or keywords of the accessed content."  Although SBJ agrees that the visitor file can contain visitor preference and behavior information based on the content that the visitor viewed and accessed, SBJ argues that the visitor file can also contain much more.  In particular, SBJ argues that the specification teaches that the visitor file can also contain demographic information provided by the visitor (as opposed to information observed about the visitor).  For example, the specification explains that "[t]he profile may also be augmented with explicit information *the visitor provides* over time, such as a *name or address* provided when ordering a product from the site."  *Id.* at 2:42-45 (emphasis added).

## 2.  Analysis

Buy.com's proposed construction would read a preferred embodiment out of the specification.  The specification expressly describes including in the visitor data file information provided by the visitor, such as the visitor's name and address.  *See* '592 Patent at 2:41-44.  Furthermore, the specification explains that:

> If a visitor file exists for the current visitor, the program accesses such visitor file to determine the visitor's interests as determined by the keywords associated with prior Web Content Items served…. The program then selects a pre-customized page or pre-customized page components which should reflect this interest. These selections can be assembled by a component assembler 340, and *may be further subject to personal modification by a monogrammer 330 to make changes such as inserting the visitor's name onto the page*.

Id. at 6:60-7:5 (emphasis added).  As such, Buy.com's proposed construction is rejected.

The court concludes that "personalized data file" means "a collection of information about or corresponding to a visitor, including interest/preference information (such as the visitor's behavior or demographic information), which can be provided by or observed about the visitor."

**d. "Generating at least one pre-customized display for a first visitor" (1, 16)**

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| **Claim 1**:<br><br>A method of customizing a web site, said method comprising:<br><br>labeling content of the web site;<br><br>when at least one visitor accesses the content of a web site, registering the labeled accessed content in a personalized data file;<br><br>storing the data file for the at least one visitor;<br><br>**generating at least one pre-customized display for a first visitor**;<br><br>…. | Creating a pre-customized display for a first visitor. | Creating a "pre-customized display" based on data accumulated in a first visitor's personalized data file. |
| **Claim 16**:<br><br>A computer program product for operating a web site on a server computer, the computer program product comprising:<br><br>a computer usable medium having computer readable program code means embodied in said medium for searching, said computer readable program code means comprising;<br>…<br>**means for generating a set of pre-customized displays**; | Creating a set of pre-customized displays. | Creating a "pre-customized display" based on data accumulated in a first visitor's personalized data file. |

**1. The Parties' Construction Arguments**

The parties agree that "generating" means "creating." The parties' dispute centers on whether the pre-customized display created for the first visitor must be "based on data accumulated in a first visitor's personalized data file." Buy.com argues that the specification teaches that each time a pre-customized page is delivered to a visitor, whether it is dynamically generated for a first visitor or re-displayed to a second visitor, the system necessarily looks to the visitor's data file to deliver content that is personalized or appears personalized to the visitor: "[t]he present invention then delivers personalized pages to the visitor by examining such visitor's profile." *Id.* at 2:46-47. Thus, Buy.com contends that one skilled in the art would understand that "generating a pre-customized display for a first visitor" means "creating a pre-customized display based on data accumulated in a first visitor's personalized data file."

In response, SBJ notes that although the "personalized data file" language appears nowhere in the "generating" terms of claims 1 and 16, it often appears in other claim terms. *See, e.g.*, *id.* at Claim 1 (reciting "when at least one visitor accesses the content of a web site, registering the labeled accessed content in a *personalized data file*) (emphasis added). As such, SBJ argues that the patentees clearly knew how to include the term "personalized data file" in the express claim language, and therefore, the term should not be read into the "generating" terms. Furthermore, SBJ notes that there is no mention of a "first visitor" in claim 16, and therefore, Buy.com inappropriately seeks to inject the concept of a "first visitor" into claim 16 when the patentees expressly did not do so.

## 2. Analysis

Claims 1 and 16 require that when a visitor accesses the content of a web site, the accessed content is registered in a personalized data file. Then that data file is stored and a pre-customized display is generated based on the information stored in the visitor's data file. Furthermore, as Buy.com notes, the specification teaches that the "invention delivers personalized pages to the visitor by examining such visitor's profile." *Id.* at 2:46-47. As such, the court adopts Buy.com's proposed limitation, requiring the pre-customized display to be generated from a personalized data file because it comports with both the claim language and the specification. The court, however, agrees with SBJ that the concept of a "first visitor" should not be read into claim 16 by the court's construction of the "generating" phrases. As such, the court concludes that: (1) "generating at least one pre-customized display for a first visitor" means "creating a pre-customized display based on data accumulated in a first visitor's personalized data file;" and (2) "means for generating a set of pre-customized displays" means "creating a set of pre-customized displays based on data accumulated in a personalized data file."

### e. "Pre-customized display is not generated until a first visitor requires such a display" (7)

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 7. The method of claim 1 wherein the displaying of the **pre-customized display is not generated until a first visitor requires such a display.** | The pre-customized display is not created until a first visitor initially requires it. | A "pre-customized display" is not dynamically created until a "first visitor" initially requires it. |

The parties have agreed that the phrase "the pre-customized display is not generated until a first visitor requires such a display" means "the pre-customized display is not created until a first visitor initially requires it." As such, the court adopts the parties' agreed construction.

### f. "Server computer" (1, 11, 16, and 17)

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 11. A computer readable memory that can direct **a web site server computer** to function in a specified manner, comprising: | One or more computers that have one or more programs which serve content over a network to other computers. | A computer that has one or more programs which serves content over a network to other computers. |

#### 1. The Parties' Construction Arguments

The parties' only dispute regarding the proper construction of the term "server computer" is whether the term can refer to one or more computers. SBJ argues that the specification is clear that "a web site" can be composed of more than one server computer:

> FIG. 4 shows another embodiment 400 of the invention wherein there are multiple instances of the Server request handler and associated machinery. Web sites often use this form of functional replication to achieve higher performance by sharing the load across *multiple server machines*....Each server request handler is a complete copy and typically each one operates on a separate machine.

'592 Patent at 7:28-32 (emphasis added); *see also id.* at 3:44-48 ("It is another object of the invention to allow for visitor profile data to be gathered and updated efficiently even in the case where *multiple web servers* are operating simultaneously to deliver information to users in

parallel.") (emphasis added); 4:11-15 ("FIG. 1 illustrates a client-server computer network 100 that may be operated in accordance with the present invention. For the preferred embodiment, the network 100 includes at least one client computer 110 and *at least one* server computer 130.") (emphasis added). Therefore, SBJ argues that the court should construe "server computer" to mean one or more computers that have one or more programs which serve content over a network to other computers.

In response, Buy.com argues that the patentees specifically claimed "multiple servers" in claim 8, but failed to do so in any other claim. Thus, Buy.com contends that the context of the claim language and the specification indicate that patentees intended to use "a server computer" to have its normal singular meaning.

## 2. Analysis

The indefinite article "'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). This convention is overcome "only in rare circumstances when the patentee evinces a clear intent to…limit the article." *Id.* In fact, in *Free Motion Fitness* the convention was not overcome even though the patentee made references to a "single" cable in the specification – despite this reference to a "single" cable, the Federal Circuit concluded that "a cable" meant "one or more cables." *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1350 (Fed. Cir. 2005).

In this case, the intrinsic record does not support Buy.com's argument that a "server computer," as used in the '592 Patent, should be limited to one computer. Quite the contrary, as SBJ demonstrated, the specification of the '592 Patent shows that the patentees intended the invention to work with multiple server computers. Furthermore, the extrinsic record

demonstrates that the industry definition of "server" at the time the patent was filed encompasses multiple servers:

> "Server: A computer in a network shared by multiple users. The term may refer to both the hardware and software or just the software that performs the service. For example, Web server may refer to the Web server software in a computer that also runs other applications, or, it may refer to a computer system dedicated to the Web server application. *There would be several dedicated Web servers in a large web site.*"

The Computer Desktop Encyclopedia at 806, attached as Exhibit 3 to Plaintiff's Markman Brief, Dkt. No. 229 (emphasis added). As such, the court concludes that "server computer" means "one or more computers that have one or more programs which serve content over a network to other computers."

### g. "First Visitor" (1)

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 1. A method of customizing a web site, said method comprising:<br><br>    labeling content of the web site;<br><br>    when at least one visitor accesses the content of a web site, registering the labeled accessed content in a personalized data file;<br><br>    storing the data file for the at least one visitor;<br><br>    generating at least one pre-customized display for a **first visitor**;<br><br>    … | Plain and Ordinary Meaning. | A specific person that accesses a web site. |

The parties have agreed that "first visitor" means "a specific person that accesses a web site."

### h. "Analyzing the data file of a second visitor and associating the second visitor with the at least one pre-customized display" (1)

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 1. A method of customizing a web site, said method comprising: <br><br> labeling content of the web site; <br><br> when at least one visitor accesses the content of a web site, registering the labeled accessed content in a personalized data file; <br><br> storing the data file for the at least one visitor; <br><br> generating at least one pre-customized display for a first visitor; <br><br> caching the at least one pre-customized displays on the server computer; <br><br> displaying the at least one pre-customized display to the first visitor; <br><br> **analyzing the data file of a second visitor and associating the second visitor with the at least one pre-customized display**, wherein analyzing is performed after generating; and <br><br> displaying the at least one pre-customized display to the second visitor, wherein the at least one pre-customized display is not regenerated | Identifying the at least one pre-customized display based on a review of information in the data file of the second visitor. | Accessing a "second visitor's" "data file," examining the accumulated data, identifying the visitor's preferences based on the accumulated information in the "visitor's data file," and linking the "second visitor" to at least one "pre-customized display" that was previously generated. |

### 1. The Parties' Construction Arguments

The parties do not dispute that when a visitor accesses a web site, the visitor's file is reviewed to identify pre-customized web content that can be delivered to the web site visitor such that it appears personalized for that visitor. *See* '592 Patent at 2:45-46 ([t]he present invention then delivers personalized pages to the *visitor by examining the visitor's profile.*) (emphasis added). The main dispute between the parties regards whether the data reviewed is limited to visitor "interest" or "preference" data. According to SBJ, the specification expressly states that selection of the content may be based on demographic information as well as preference information contained in the visitor file. *Id.* at 2:15-21. In reply, Buy.com argues that although SBJ contends that the data accumulated in the visitor's profile may be indicative of

more than the visitor's interest or preferences, nowhere does the specification describe how any additional demographic information is collected or used. Therefore, Buy.com argues that the intrinsic record does not support SBJ's proposed construction.

## 2. Analysis

The '592 Patent never disavows the possibility that demographic data could be included in the visitor file. To the contrary, the specification actually states that demographic information can be accumulated in the visitor file. *Id.* at 2:15-21 ("The invention is a method and apparatus for learning in what a visitor is interested and *what demographics the visitor may demonstrate* so as to deliver personalized information to the visitor based upon accumulated data….") (emphasis added). As such, the court rejects Buy.com's argument that the reviewed data can only be preference and interest data. Furthermore, in accordance with the court's construction of "pre-customized" as detailed above, the court rejects Buy.com's "previously generated" language. The court concludes that SBJ's proposed construction is consistent with both the claim language and the specification, and therefore, construes "analyzing the data file of a second visitor and associating the second visitor with the at least one pre-customized display" to mean "identifying the at least one pre-customized display based on a review of information in the data file of the second visitor."

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 10. A computer-readable medium having computer executable software code stored thereon, the code for personalizing a web site without dynamically generated web pages for each visitor, the code comprising:<br><br>code for labeling the content of a web site with selected categories;<br><br>code for generating a data file for a visitor;<br><br>code for **accumulating information regarding labeled content**, to place such information in the visitor data file;<br><br>… | Gathering and/or updating information regarding labeled content in which the visitor has indicated an interest. | Gathering data about visitor interest based upon the categories and/or keywords of the accessed content. |

## 1. The Parties' Construction Arguments

The specification describes the "accumulation process" as follows:

> The accumulation process functions when a visitor accesses a URL and the associated Web Content Items. At that point the program *registers the representative categories* belonging to the web page…. *[T]he statistics on the accessed categories* is updated in the visitor's file.

'592 Patent at 5:61-67 (emphasis added); *see also id.* at 5:51-55 ("This personalization can be done according to the accumulated data in the visitor's file, gathered implicitly by *observing which Web Content Items*, and therefore which *categories* have been of interest to the visitor in the past.") (emphasis added); 7:22-27 ("The server request handler 320 can then update the visitor file data with the *categories and keyword counts* for the information assembled into the final page that is returned to the visitor's browser.") (emphasis added). SBJ argues that the specification clearly teaches that when a visitor indicates an interest in content on the web site, information about that content – for example, the categories assigned to such content or that such content was accessed – is gathered in the visitor file.

In response, Buy.com argues that although SBJ correctly points out that the visitor's data file contains information about the labeled content that the visitor previously accessed, it fails to

recognize that the information relating to that labeled content reflects the visitor's interests. As such, Buy.com proposes that the "accumulating" terms should be construed as meaning "gathering data about visitor interest *based upon* the categories and/or keywords of the accessed content."

### 2. Analysis

Buy.com's proposed construction is contrary to the plain language of claims 10 and 17 and the specification. Claims 10 and 17 state that the "information" being accumulated is information "regarding the labeled content" – not, as Buy.com proposes, information "about a visitor's interest." Furthermore, as SBJ points out, the specification clearly teaches that the accumulation process functions to gather information regarding labeled web content, such as categories, keyword counts, and statistics. '592 Patent at 5:61-67; 5:51-55; 7:22-27. As such, the court rejects Buy.com's proposed construction. The court concludes that "accumulating information regarding labeled content" means "gathering and/or updating information regarding labeled content in which the visitor has indicated an interest."

### j. "Determining the selected category associated with the visitor's interest" (10)

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 10. A computer-readable medium having computer executable software code stored thereon, the code for personalizing a web site without dynamically generated web pages for each visitor, the code comprising:<br><br>…<br><br>code for **determining the selected category associated with the visitor's interest,** wherein such determination is based on the accumulated information in the visitor data file; and<br><br>… | Indentifying a selected category corresponding to the visitor's interests/preferences. | Deciding which of the "selected categories" is most closely linked with the data gathered in the "visitor data file." |

## 1. The Parties' Construction Arguments

As described above, when a visitor accesses content, information about that content can be accumulated into the visitor file. The visitor file can contain, for example, "the categories and keyword counts" for the content presented to the visitor. '592 Patent at 7:22-27; *see also* 5:66-67 ("[T]he statistics on the accessed categories is updated in the visitor's file."). The parties agree that, based on a review of this accumulated information, a selected category that corresponds to the visitor's interests can be identified. *See, e.g.,* '592 Patent at 5:51-55 ("This personalization can be done according to the accumulated data in the visitor's file, gathered implicitly by observing which Web Content Items and, therefore, which categories have been of interest to the visitor in the past."). The parties' dispute centers on whether the selected category must be the category "most closely linked" with the visitor's interest.

Buy.com can point to nothing in the specification or prosecution history of the '592 Patent to support its contention that the "selected category" must be the category that is "most closely linked" to the visitor's preferences. Furthermore, during oral arguments, Buy.com admitted that there is no hierarchy for choosing categories disclosed in the '592 Patent. As such, SBJ argues that the court should reject Buy.com's proposed construction.

## 2. Analysis

Considering that there is no indication that the patentees intended to limit the "selected category" to the category that is most closely linked with a visitor's preference, the court rejects Buy.com's proposed construction. The court concludes that "determining the selected category associated with the visitor's interest" means "identifying a selected category corresponding to the visitor's interests/preferences."

### k. The Means-Plus-Function Limitations

### 1. The Parties' Construction Arguments

Claim 16 of the '592 Patent recites:

16. A computer program product for operating a web site on a server computer, the computer program product comprising:

> a computer usable medium having **computer readable program code means** embodied in said medium for searching, said computer readable program code means comprising;
>
>> **means for labeling** the content of a web site;
>>
>> when at least one visitor accesses the content of a web site, **means for registering** the labeled accessed content in a personalized data file;
>>
>> **means for storing** the data file for at least one visitor;
>>
>> **means for generating** a set of pre-customized displays;
>>
>> **means for caching** the set of pre-customized displays on the server;
>>
>> when the at least one visitor accesses a Web Site, **means for analyzing** the data file of the visitor and associating the user with a precustomized display; and
>>
>> **means for displaying** the pre-customized display onto a web page accessed by the visitor.

The parties agree the "means" limitations of claim 16 are subject to 35 U.S.C. § 112 ¶ 6. The parties also agree as to the various functions associated with these terms. Buy.com, however, argues that the '592 Patent fails to identify any algorithms corresponding to the "means" limitations of claim 16. As such, Buy.com contends that the '592 Patent does not provide adequate structure for the means-plus-function limitations of claim 16 and, therefore, those terms must be deemed indefinite. *Aristocrat Technologies Australia PTY LTD. v. Int'l Game Tech. and IGT*, 521 F.3d 1328 (Fed. Cir. 2008).

In reply, SBJ argues that this court has found that "computer code" can provide sufficient structure for one of ordinary skill in the art to understand claim terms. *Beneficial Innovations, Inc. v. Blockdot, Inc.,* Nos. 2:07-CV-263-TJW-CE, 2:07-CV-555-TJW-CE, 2010 WL 1441779, at *15 (E.D. Tex. April 12, 2010); *Aloft Media, LLC v. Adobe Sys., Inc.*, 570 F. Supp. 2d 887, 898 (E.D. Tex. 2008). Furthermore, SBJ notes that to the extent further disclosure of structure in the form of an algorithm is required, such algorithm may "be expressed textually." *Computer Acceleration Corp v. Microsoft Corp.*, 516 F. Supp. 2d 752, 763-64 (E.D. Tex. 2007); *see also Ariba, Inc., v. Emptoris, Inc.*, 2008 WL 3482521, at *10 (E.D. Tex. Aug. 7, 2008). SBJ argues that each of the clauses that make up the "computer readable program code means" limitations of claim 16 are sufficiently described in the text of the specification to provide structure necessary for one of ordinary skill to understand the claim. *Ariba*, 2008 WL 3482521 at *10-12. SBJ has provided the court with a chart depicting the textual algorithms it contends support the means-plus-function limitations of claim 16. *See* Exhibit A to SBJ's Reply Brief, Dkt. No. 241. The "means" terms of claim 16, and the algorithms that SBJ contends provide structure for those terms, will be discussed individually below.

## 2. Analysis

SBJ's reliance on *Aloft Media* and *Beneficial Innovations* to support its contention that "computer code" and "computer programs" are sufficient structure is misplaced. Both cases are distinguishable because the claims at issue in those cases were not stated in "means for" language. *Beneficial Innovations*, 2010 WL 1441779, at *15; *Aloft Media,* 570 F. Supp. 2d at 898. Therefore, there was no presumption that 35 U.S.C. § 112 ¶ 6 applied. The court merely held that such claims were not rendered means-plus-function claims simply by the inclusion of

the words "computer code." Here, however, the claim terms are in means-plus-function format, and both parties have agreed that 35 U.S.C. § 112 ¶ 6 applies.

Although neither *Aloft Media* nor *Beneficial Innovations* is applicable in this case, *Ariba* is applicable. *Ariba*, 2008 WL 3482521 at *10. In *Ariba*, the court explained that when the functions at issue are computer implemented, the patent must disclose an algorithm to be performed by the computer to accomplish the recited functions. *Id*. The court, however, noted that this does not mean that the patentee must disclose specific source code for the computer. *Id.* The term "algorithm" is not limited to a formula of mathematical symbols. For example, the court explained, the steps, formula, or procedures to be performed by the computer might be expressed textually, or shown in a flowchart. Regardless of the format, however, the structure must be sufficiently disclosed so that one of ordinary skill in the art can determine the limitations on what is claimed. *Id*.

In applying these principles, the court construed a limitation requiring a "program code means" sufficient to accomplish a recited function. *Id*. The court concluded that the specification of the patent-in-suit recited sufficient structure because the function itself was described in the specification and that description linked the function to sufficient structure because: (1) it laid out the manner in which the information flows in the invention; (2) specified where each piece of information to be displayed resides; and (3) specifies the software architecture within which the function was to be accomplished. In short, the court concluded that "the 'first computer readable program code means' claim limitation, when viewed by one of ordinary skill in light of the specification references…, discloses common software" sufficient to accomplish the required task. Considering *Ariba*, the court will individually assess whether

the specification of the '592 Patent discloses sufficient structure for the means-plus-functions terms in claim 16.

**a. a computer usable medium having computer readable program code means embodied in said medium for searching, said computer readable program code means comprising;**

The parties agree that the function of the "computer readable program code means" is "searching." SBJ argues that the structures corresponding to this function are disclosed in the specification at: 2:50-55; 7:6-10; 4:29-39; 5:60-67; 6:50-66; 6:60-63; 6:66-7:1. For example, at column 2, lines 49-61 the specification explains how the invention searches for, or locates, personalized page fragments and then assembles those fragments into a seemingly customized page for a visitor:

> The present invention then delivers personalized pages to the visitor by examining such visitor's profile. Another directive, called a personalization directive, may be placed into web pages that are to be customized by the invention. These directives cause a personalization function to be applied to the visitor's profile data. The result of the personalization function defines an attribute to be used for locating personalized page fragments, called "page components", that the invention then assembles into a customized page for the visitor. In this manner, each visitor may receive a page containing three different classes of data: common data received by all visitors, personalized data received by a similar group of visitors, and individual data received only by this one visitor. The present invention assembles all of this data and delivers a "personalized" page to the visitor.

The court agrees with SBJ that this section, when read in conjunction with the other sections identified by SBJ, provides sufficient structure for the searching function. Furthermore, figure 3, and the various sections SBJ identifies describing figure 3, discloses a flowchart explaining how the searching function is performed in the context of the '592 Patent. As such, the court concludes that the following sections of the specification provide the structure corresponding to the "computer readable program code means embodied in said medium for searching" limitation: 2:50-55; 7:6-10; 4:29-39; 5:60-67; 6:50-66; 6:60-63; 6:66-7:1

### b.  means for labeling the content of a web site

The parties agree that the function of the "means for labeling the content of a web site" is "labeling content of the website." The specification explains that a developer implementing the invention assigns "at least one category and/or keyword to each of the Web Content Items. These categories and keywords are used to determine visitor interests when they access Web Content Items on a Web Site." '592 Patent at 5:40-43. The specification goes on to explain how these labeled categories and/or keywords are used in the context of the '592 Patent:

> The accumulation process functions when a visitor accesses a URL and the associated Web Content Items. At that point the program registers the representative categories belonging to the web page….[T]he statistics on the accessed categories [sic] is updated in the visitor's file.

*Id.* at 5:61-67; *see also id.* at 2:31-40; 6:60-65. The court concludes that the following sections of the specification of the '592 Patent provide sufficient structure for the "means for labeling the content of a web site" limitation: 5:40-43; 2:31-40; 4:29-39; 5:61-64; 6:60-65.

### c.  means for registering the labeled accessed content in a personalized data file

The parties agree that the function of the "means for registering the labeled accessed content" is "registering labeled access content in a personalized data file." As demonstrated above, the specification explains that the invention accumulates information about a visitor by registering the category and/or keyword associated with a web page accessed by the visitor in the visitor's data file. *Id.* at 5:61-67. In explaining the flowchart depicted at figure 3, the specification goes on to explain exactly how the labeled content flows through the invention and is finally registered in a visitor's data file:

> The server request handler 320 can then update the visitor file data with the categories and keyword counts for the information assembled into the final page that is returned to the visitor's browser. The updated visitor file data is delivered back to the visitor data manager 350 and stored in the visitor data file store 375 by the visitor file manager 370.

*Id.* at 7:22-27; *see also id.* at 7:32-65. The court concludes that the following sections, when read in conjunction, provide sufficient structure for the "means for registering the labeled accessed content in a personalized data file" limitation: 5:61-67; 2:34-45; 7:21-65; 4:29-39; 7:32-65.

### d. means for storing the data file for at least one visitor

The parties agree that the function of the "means for storing the data for at least one visitor" is "storing the data file for at least one visitor." The specification explains:

> The server computer 130 includes standard server computer components, including a network connection device 138, a CPU 132, and a memory (primary and/or secondary) 134. The memory 134 stores a set of computer programs to implement the processing associated with the invention. These programs arc collectively referred to as a [sic] the web server software 136. The invention may be used with any web server software, including, but not limited to, Netscape Enterprise Server from Netscape Inc., Internet Information Server from Microsoft, or Apache from the Apache HTTP Server Project.

'529 Patent at 4:29-39. Then, as discussed above, the specification depicts a flowchart at figure 3, explaining how information flows through the "server computer 130" to finally be stored in a visitor data file. *Id.* at 6:43-50; 7:22-27. As such, the court concludes that the following sections of the specification disclose sufficient structure for the "means for storing the data file for at least one visitor" limitation: 4:29-39; 6:43-50; 7:22-27; 7:32-65.

### e. means for generating a set of pre-customized displays

The parties agree that the function of the "means for generating a set of pre-customized displays" is "generating a set of pre-customized displays." In considering this limitation, the court has carefully reviewed the following sections of the specification and the figures accompanying them: 2:46-3:23; 6:28-42; 6:43-7:10; 5:49-60; 4:29-39. These sections detail the manner in which the invention generates pre-customized displays for a visitor. In particular, as the description accompanying it explains, figure 3 depicts the flow of information

through the invention. As such, the court concludes that the following sections of the specification provide sufficient structure for the "means for generating a set of pre-customized displays" limitation: 2:46-3:23; 6:28-42; 6:43-7:10; 5:49-60; 4:29-39.

### f. means for caching the set of pre-customized displays on the server

The parties agree that the function of the "means for caching the set of pre-customized displays on the server" is "caching the set of pre-customized displays on the server." The specification teaches that the invention stores pre-customized pages in cache and that those cached, pre-customized pages are stored in "pre-customized file store 365" (depicted in figure 3) on a server computer. *Id.* at 2:61-3:5; 7:6-11. As discussed above, the specification explains the necessary components of the server computer, which includes memory. *Id.* at 4:29-39. And at various places throughout the specification it is explained that pre-customized pages and/or web content items are "cached in memory." *Id.* at 6:11; *see also id.* at 5:55-60. The court concludes that the following sections of the specification provide sufficient structure for the "means for caching the set of pre-customized displays on the server" limitation: 2:61-3:5; 7:6-11; 5:55-60; 6:11; 4:29-39.

### g. means for analyzing the data file of the visitor and associating the user with a precustomized display

The parties agree that the function of the "means for analyzing the data file of the visitor and associating the user with a precustomized display" is "analyzing the data file of the visitor and associating the user with a pre-customized display." In considering this limitation, the court has focused on the following sections of the '592 Patent: 6:6-10; 2:46-61; 6:43-7:11; 4:29-29; 6:37-42. When read in conjunction, these sections explain the means by which the invention accesses a visitor's data file, analyzes that data, and then provides the visitor with a pre-customized display – i.e., they describe the flow of information through the invention. As

such, the court concludes that the following sections of the specification provide sufficient structure for the "means for analyzing the data file of the visitor and associating the user with a precustomized display" limitation: 6:6-10; 2:46-61; 6:43-7:11; 4:29-29; 6:37-42.

### h. means for displaying the pre-customized display onto a web page accessed by the visitor

The parties agree that the function of the "means for displaying the pre-customized display onto a web page accessed by the visitor" is "displaying the pre-customized display onto a web page accessed by the visitor." In describing figure 3 (a relationship diagram for the invention), the specification explains the different steps necessary for the invention to assemble pre-customized page components for display to a visitor. *Id.* at 6:43-7:11. As such, the court concludes that the following sections of the specification provide sufficient structure for the "means for displaying the pre-customized display onto a web page accessed by the visitor" limitation: 6:28-7:11; 2:59-66; 3:6-24; 4:29-39.

### l. "Embodied in said medium for searching" (16)

| Representative Claim Language | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| 16. A computer program product for operating a web site on a server computer, the computer program product comprising:<br><br>a computer usable medium having computer readable program code means **embodied in said medium for searching**, said computer readable program code means comprising; | Stored in said medium and capable of searching. | Indefinite. |

Buy.com contends that the phrase "embodied in said medium for searching" is indefinite and not amendable to construction because the specification does not discuss a searching function. SBJ, however, notes that there are numerous locations in the specification where the ability to search is disclosed, including:

These directives cause a personalization function to be applied to the visitor's profile data. The result of the personalization function defines an attribute to be

used for *locating* personalized page fragments, called "page components", that the invention then assembles into a customized page for the visitor.

'592 Patent at 2:50-55 (emphasis added); *see also id.* at 6:60-63; 6:66-7:1; 7:6-10.

The court rejects Buy.com's contention that the phrase "embodied in said medium for searching" is indefinite. As demonstrated above, the specification explains that the invention must be able to locate personalized page fragments and then assemble those fragments into a customized page for a visitor. In light of this, one of ordinary skill in the art would understand that the computer readable program means referenced in claim 16 must be able to search for page components that can be assembled into a customized page. As such, the phrase "embodied in said medium for searching" is not indefinite. The court concludes that "embodied in said medium for searching" means "stored in said medium and capable of searching."

## VI.  CONCLUSION

The court adopts the constructions set forth in this opinion for the disputed terms of the '592 Patent. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

It is so ORDERED.

SIGNED this 15th day of March, 2011.


_____
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE